Filed 11/16/21  P. v. Standridge CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>JACQUELINE STANDRIDGE,<br><br>Defendant and Respondent. | F079125<br><br>(Tulare Super. Ct. No. VCF366971)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Brett R. Aldredge, Judge.

Tim Ward, District Attorney, Dan Underwood, Chief Deputy District Attorney, Cindy Underwood, Adam Clare, and Katie Denson, Deputy District Attorneys, for Plaintiff and Appellant.

Jake Stebner, under appointment by the Court of Appeal, for Defendant and Respondent.

-ooOoo-

## INTRODUCTION

Respondent and defendant Jacqueline Standridge (defendant) was arrested and charged with three felony offenses after allegedly stabbing her son with a knife. Prior to the preliminary hearing, she moved for pretrial mental health diversion pursuant to Penal Code[1] section 1001.36, based on the argument that she suffered from alcohol use disorder (AUD), posttraumatic stress disorder (PTSD), and major depressive disorder (MDD), and those conditions were significant factors in the commission of the charged offenses.

The Tulare County District Attorney's Office opposed the diversion motion and argued there was insufficient evidence of defendant's mental health condition at the time of the charged offenses or that her alleged mental health issues were significant factors in the commission of the offenses. It was also argued that she could not successfully complete diversion since she had failed prior treatment programs, and she posed a risk to public safety because of the nature of the charged offenses.

An evidentiary hearing was held, and a social worker employed by the public defender's office testified about defendant's mental health history and her current diagnoses based on his review of her medical and mental health records. The superior court granted defendant's diversion motion and placed her on a very specific treatment plan.

Thereafter, the People of the State of California, as appellant and represented by the district attorney, filed the instant appeal from the trial court's order that granted the diversion motion, based on an issue that they did not raise in the superior court – that a social worker can never testify in support of a diversion motion, and only a psychiatrist or licensed psychologist may appear as a "qualified mental health expert" within the meaning of section 1001.36. Defendant argues the People have forfeited appellate review of this issue since they never raised it below.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

We affirm the trial court's order and find the People failed to raise their challenge to the social worker's testimony at the diversion hearing and have forfeited appellate review of their current contention that only a psychiatrist or licensed psychologist can testify as a qualified mental health expert in support of a diversion motion.

## FACTS[2]

On June 15, 2018, defendant was with two of her sons. She pointed a knife at 16-year-old K.S. and yelled that he had to give his wallet to her, or she would stab him. K.S. went outside to get away from her. She followed K.S. and stabbed him in the stomach and ran away. She was subsequently arrested.[3]

## PROCEDURAL BACKGROUND

On June 19, 2018, a complaint was filed in the Superior Court of Tulare County charging defendant with three felonies: count 1, assault of K.S. with a deadly weapon, a knife (§ 245, subd. (a)(1)); count 2, child abuse of K.S. under circumstances likely to cause great bodily injury or death (§ 273A, subd. (a)); and count 3, grand theft of personal property exceeding $950, two cell phones belonging to D.W. (§ 487 subd. (a)).[4]

On the same day, the court held the arraignment, and defendant pleaded not guilty. The court issued a criminal protective order prohibiting any contact with K.S. and D.W. Defendant was remanded into custody.

**Pretrial release report**

Also, on June 19, 2018, the probation department filed a pretrial release report with the court, that stated defendant had a high risk of not appearing if released.

---

[2] The factual summary is from defendant's motion for diversion since she moved for diversion prior to the preliminary hearing.

[3] The record before this court states an ambulance responded to the scene but does not reveal the nature or extent of the injuries suffered by K.S.

[4] Defendant's diversion motion identified D.W. as a longtime family friend who knew defendant's sons and was present that day.

Defendant told the probation officer that she drank three 24-ounce cans of "alcohol" and smoked a marijuana joint every day; she stopped using methamphetamine six months earlier. Defendant said she had been diagnosed with bipolar disorder, posttraumatic stress disorder, and suffered seizures.

On July 2, 2018, the court denied defendant's motion for release on her own recognizance (OR). Defendant remained in custody for the entirety of the proceedings.

**Section 4011.6 referral**

On September 26, 2018, the court referred defendant for a mental health evaluation pursuant to section 4011.6.[5]

On October 31, 2018, the court received the section 4011.6 report and continued the matter.

## PRETRIAL MENTAL HEALTH DIVERSION

Effective on June 27, 2018, the Legislature enacted a discretionary pretrial diversion program for people with qualifying mental disorders. (§§ 1001.35, 1001.36, added by Stats. 2018, ch. 34, § 24; *People v. Frahs* (2020) 9 Cal.5th 618, 626 (*Frahs*); *People v. Moine* (2021) 62 Cal.App.5th 440, 447 (*Moine*).)

Section 1001.36 states that a trial court may grant pretrial diversion if it finds all of the following. First, the court must be "satisfied that the defendant suffers from a mental disorder as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders …." (§ 1001.36, subd. (b)(1)(A).)[6] "Section 1001.36,

---

[5] Section 4011.6 provides for the transfer of jail inmates who may be mentally disordered to a facility for 72-hour treatment and evaluation pursuant to Welfare and Institutions Code section 5150. (*Del Castillo v. Superior Court* (2019) 38 Cal.App.5th 1117, 1121.)

[6] Unless otherwise indicated, all further citations to the "DSM-5" are to the fifth and current edition of the Diagnostic and Statistical Manual of Mental Disorders (2013), which the trial court and the parties discussed at the diversion hearing. The DSM-5 is "a handbook published by the American Psychiatric Association and used by health care professionals all over the world as an authoritative guide to the diagnosis of mental

subdivision (b)(1)(A) defines a qualifying mental disorder as one that is 'identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders, including, but not limited to, bipolar disorder, schizophrenia, schizoaffective disorder, or post-traumatic stress disorder, but excluding antisocial personality disorder, borderline personality disorder, and pedophilia.' " (*Moine, supra*, 62 Cal.App.5th at p. 449.)[7]

"Evidence of the defendant's mental disorder shall be provided by the defense and shall include a recent diagnosis by *a qualified mental health expert*. In opining that a defendant suffers from a qualifying disorder, the qualified mental health expert may rely on an examination of the defendant, the defendant's medical records, arrest reports, or any other relevant evidence." (§ 1001.36, subd. (b)(1)(A), italics added.)[8]

Second, the court must be "satisfied that the defendant's mental disorder was a significant factor in the commission of the charged offense." (§ 1001.36, subd. (b)(1)(B).) "A court may conclude that a defendant's mental disorder was a significant factor in the commission of the charged offense if, after reviewing any relevant and credible evidence, including, but not limited to, police reports, preliminary hearing transcripts, witness statements, statements by the defendant's mental health treatment provider, medical records, records or reports by qualified medical experts, or evidence that the defendant displayed symptoms consistent with the relevant mental disorder at or near the time of the offense, the court concludes that the defendant's mental

---

disorders." (*Acevedo Granados v. Garland* (9th Cir. 2021) 992 F.3d 755, 760, fn. 1; *People v. Johnson* (2015) 235 Cal.App.4th 80, 83 & fn. 2.)

[7] Effective January 1, 2019, section 1001.36 was amended to state that defendants charged with murder, voluntary manslaughter, and enumerated sexual assault offenses are ineligible for diversion. (*Frahs, supra*, 9 Cal.5th at pp. 626–627; § 1001.36, subd. (b)(1)(F); Stats. 2018, ch. 1005, § 1.)

[8] As the People concede, section 1001.36 does not define the phrase "qualified mental health expert."

disorder substantially contributed to the defendant's involvement in the commission of the offense." (*Ibid.*)

Third, "a qualified mental health expert" must opine that "the defendant's symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment." (§ 1001.36, subd. (b)(1)(C).) Fourth, subject to certain exceptions, the defendant must consent to diversion and waive his or her right to a speedy trial. (*Id.*, subd. (b)(1)(D).) Fifth, the defendant must agree to comply with treatment as a condition of diversion. (*Id.*, subd. (b)(1)(E).) Finally, the court must be "satisfied that the defendant will not pose an unreasonable risk of danger to public safety … if treated in the community." (*Id.*, subd. (b)(1)(F).)

"At any stage of the proceedings, the court may require the defendant to make a prima facie showing that the defendant will meet the minimum requirements of eligibility for diversion and that the defendant and the offense are suitable for diversion. The hearing on the prima facie showing shall be informal and may proceed on offers of proof, reliable hearsay, and argument of counsel…." (§ 1001.36, subd. (b)(3).)[9]

"If the defendant makes a prima facie showing that he or she meets all of the threshold eligibility requirements and the defendant and the offense are suitable for diversion, and the trial court is satisfied that the recommended program of mental health treatment will meet the specialized mental health treatment needs of the defendant, then the court may grant pretrial diversion. [Citations.] The maximum period of diversion is two years. [Citation.] If the defendant is subsequently charged with an additional crime, or otherwise performs unsatisfactorily in the assigned program, then the court may reinstate criminal proceedings. [Citation.] 'If the defendant has performed satisfactorily

---

[9] The amendments that were effective on January 1, 2019, also added subdivision (b)(3) to section 1001.36, prior to when the court held the evidentiary hearing on defendant's diversion motion in this case. (Stats. 2018, ch. 1005, § 1, eff. Jan. 1, 2019.)

in diversion, at the end of the period of diversion, *the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion' and 'the arrest upon which the diversion was based shall be deemed never to have occurred*.' [Citation]" (*Frahs, supra*, 9 Cal.5th at p. 627, italics added.)

The court's decision on a motion for diversion is reviewed for an abuse of discretion, and factual findings are reviewed for substantial evidence. (*Moine, supra*, 62 Cal.App.5th at pp. 447–449; *People v. Oneal* (2021) 64 Cal.App.5th 581.)

## DEFENDANT'S MOTION FOR DIVERSION

On December 20, 2018, defendant filed a motion for pretrial mental health diversion pursuant to section 1001.36. The motion was based on a report, prepared by the public defender's social worker, that defendant suffered from AUD, that it was a qualifying disorder listed in the DSM-5, and she was not otherwise ineligible under the other provisions of section 1001.36.[10]

**The social worker's report**

The motion was supported by a lengthy report prepared by Benjamin Beach, M.S.W., a social worker with the public defender's office who had a master's degree in social work. Mr. Beach reviewed defendant's records from Kaweah Delta Hospital, the mental health division of the Tulare County Health and Human Services Agency, and her criminal history. He also interviewed defendant, the minor victim, and his guardian.

### *Defendant's history*

According to the report, defendant was 41 years old at the time of the proceedings, and suffered from a history of substance abuse, diagnosed mental health disorders, and "a complex trauma history from her early childhood to her recent past."

---

[10] As will be explained below, there was evidence at the hearing on defendant's motion that she was also diagnosed with major depressive disorder and posttraumatic stress disorder.

When defendant was four years old, she was kidnapped and sexually assaulted by a stranger and then released. When she was six years old, she was sexually assaulted by a family member. Her mother suffered from mental health problems and repeatedly beat defendant and her siblings. Defendant suffered suicidal ideations when she was a teenager and cut herself; she once took a bottle of painkillers.

Defendant married a man who suffered similar addiction and abuse issues, and her husband encouraged her to seek professional help for her problems. She attended counseling, received medication, and stabilized. They had four children, and defendant refused to physically discipline them because of her own abuse. Her husband was described as providing excellent support to her.

The report states that defendant's current mental disorders manifested after one of her children was sexually assaulted by a family member; this was the same child who she was charged with assaulting in this case. After learning about the sexual assault, defendant said she started drinking because of her guilt for failing to protect her child, prevent the incident, and help the child make sense of what happened. She also suffered "vicarious retraumatization of having a child suffer similar abuse" to what she went through as a child, and she started to self-medicate with alcohol. She lost control of her drinking, her relationship with that child became strained, and her marriage and mental health deteriorated.

As a result, defendant harmed herself and a friend took her to the Tulare County Mental Health, Health and Human Services, Visalia Adult Integrated Clinic (Visalia Clinic). Defendant received treatment and "more robust services" from a psychiatrist and a team of clinicians.

In 2011, defendant was convicted of driving under the influence. At that time, she was diagnosed with posttraumatic stress disorder (PTSD) and major depressive disorder (MDD) at the Visalia Clinic. She "suffered substantial alcoholism and depression over the following four years, as documented by her mental healthcare team."

8.

Defendant's husband, along with defendant's brother and his family, tried to intervene to get help for her alcohol abuse and mental deterioration, and made multiple attempts to send her to drug and alcohol treatment. After one such intervention, defendant resisted their attempt to take her to a rehabilitation facility by becoming intoxicated and jumping out of a two-story window. Defendant's visits to her psychiatrist became irregular, she stopped taking her medication, and her behavior became increasingly bizarre.

In 2016, defendant and her husband divorced in "a loving and amicable attempt to save their family." Defendant supported her husband's decision to live separately with and care for their four children "outside of an environment in which she was decompensating and suffering from alcoholism." Her former husband continued to support defendant and tried to encourage the children to understand defendant's mental illness and substance abuse problems.

During this period, defendant's former husband unexpectedly died of a sudden heart attack and the family was devastated. The two younger children returned to defendant's care while the two older children lived with defendant's brother and his family. Defendant stated that she was "emotionally torn apart by the death of her [former husband], who had seen her through abuse as a teenager and decades of partnership together." Her mental illness prevented her from caring for the two younger children who returned to her care, and she later realized it was "a mistake to keep the [children] close while she struggled through addiction [and] untreated mental illness after she was terminated as a consumer at Tulare County Mental Health," and she should have allowed them to remain with her brother and his family in Los Angeles.

For about one year prior to the charged offenses, defendant was no longer receiving mental health treatment from the clinic, and her untreated mental health symptoms became worse. Her condition impaired her ability to perform quality of life functions such as paying bills and meeting her family's material needs.

Defendant stated that in the months before the charged offenses, her child K.S. (the victim in the charged offenses) became angry and frustrated with her and threatened to have her committed or arrested as her alcohol consumption increased and her mental health deteriorated.

### The day of the charged offenses

On the day of the charged offenses, defendant and the two younger children were being evicted from their residence. Defendant recalled she was "experiencing severe symptoms of her mental health condition and drinking," and K.S. "continued to confront her about her behavior and the family's hardships." Defendant said she did not recall the assaultive incident, but knew she held a small knife at K.S. as he confronted her, and the exchange escalated.

The report stated that defendant's relationship with K.S. "had been damaged for years and the recent death of [the child's] father and familial hardship had brought him to adamantly demand[]" that defendant let him move to Los Angeles with the rest of the family. Defendant "recalls the racing, flustered, overwhelming feeling of psychiatric decomposition, but does not recall" what happened when she stabbed K.S. Defendant was "mortified at the thought that the severe bodily injury to which her mentally ill mother subjected her may have been revisited on her [child], which is precisely what she always intended to avoid raising children."

### Defendant's medical records

The report contained a summary of defendant's medical records. Her records from the public mental health clinic in Visalia began in 2011 and ended in June 2017, when she last received psychiatric care, case management, and medication management.

Defendant had a history of psychiatric diagnoses and treatment for disorders that were "symptomatic of her behaviors in the months leading to her arrest." She received treatment from Dr. David Kilgore, a psychiatrist, and three licensed therapists for five years. She received three diagnoses: MDD, severe and recurring without psychotic

10.

features; PTSD; and severe AUD. In 2014, defendant suffered sleep deprivation to evade nightmares about sexual abuse, and Dr. Kilgore reported her "diagnostic formulation" included the potential of insomnia, anemia, and epilepsy, which were symptomatic of sleep deprivation.

Dr. Kilgore and the treatment team ruled out borderline or other personality disorders, and concluded defendant suffered from psychiatric, traumatic, recurrent neurochemical disorders that affected her capacity to perform daily functions. She had " 'serious impairment' " in social functioning from her disorders. She successfully went into remissions from a "Stimulant Use Disorder, amphetamine type," when she was last assessed for this disorder in 2015.

In 2015, defendant's treatment team adjusted her mediations and added an antipsychotic drug and, as a result, she received the most effective medication regimen she had ever taken. However, there were few prescription refills and "she soon struggled to access psychiatric services to renew this prescription." Defendant stopped attending psychiatric treatment soon after the death of her former husband.

### *Custodial status*

The report stated that after her arrest in this case, defendant remained in custody, and she had been sober for six months. She was being treated by the jail psychiatrist and eventually received the same medications that Dr. Kilgore had earlier prescribed and found successful. Defendant stated she felt better than she had in years.

Defendant stated she recognized she needed to end her alcohol abuse because it prevented her from substantively treating her PTSD and made her MDD worse. Defendant stated she wanted "to fix everything that has broken in her life," receive appropriate treatment, and learn new coping skills, but she did not know how to deal with her alcohol abuse and mental illness. She was willing to participate in a comprehensive treatment plan to receive all needed services and restore her relationship with her children

11.

as a loving mother, as she previously did "before she was retraumatized and her mental health deteriorated."

### *The victim's statement*

In September 2018, the social worker spoke with K.S., defendant's minor child, with the permission of the child's guardian. K.S. was the victim in counts 1 and 2 of the charged offenses, and the social worker asked K.S. what happened.

K.S. stated he was at the family's apartment with defendant and his sibling, G. Defendant could not find her wallet and accused K.S. of taking it, and they argued about it for 15 minutes. K.S. did not think defendant was drunk, but said she was "high" on something. K.S. denied taking the wallet. Defendant left the apartment for a minute. When she returned, she was holding an open switchblade type knife in her hand. K.S. was not sure if she had the knife earlier, but now it was clearly visible. Defendant held the knife, asked K.S. and G. about her wallet, and said, "I brought you in this world and I can take you out."

K.S. said that he walked out, defendant followed him, and she stabbed him in the abdomen once. K.S. said that "it just kind of happened." K.S. was able to get away from her, and the police and ambulance arrived.

K.S. said that he did not think defendant stabbed him on purpose, and that she had "a long history of alcohol abuse and [K.S.] was recently informed that she has a drug addiction issue he was not aware of until recently. [K.S.] feels that [defendant] was not in her right state of mind because if she was she would have not stabbed him."

### *Statements from defendant's family about the treatment plan*

In December 2018, the social worker spoke with K.S.'s legal guardian, who was the husband of defendant's brother, and had previously joined with other family members to get defendant into treatment. The report stated the guardian was a loving and committed uncle to the two younger children and were thriving since they moved in with his family in Los Angeles after defendant's arrest.

12.

The social worker advised K.S.'s legal guardian of the proposed treatment plan for defendant. The guardian was amenable to the treatment plan and shared the details with K.S. K.S. was still upset with his mother and did not want to talk with her, but he was amenable to the plan and said he wanted his mother to get help.

### *Proposed treatment plan*

Mr. Beach's report stated defendant's circumstances had changed since her arrest because all the children lived with her brother's family in Los Angeles and were well cared for. Defendant was both relieved and embarrassed to have her brother's family care for the children, but this provided defendant "with substantial latitude to pursue her own care."

The report stated defendant required psychiatric care along with substance abuse disorder treatment for her alcoholism, and recommended the following treatment plan:

1. Enrollment in Central Valley Recovery Services, Inc., New Visions for Women Recovery Center, for an initial 30 days of Substance Use Disorder (SUD) treatment, funded by Tulare County Health and Human Services (HHSA) Alcohol and Other Drug Prevention (AOD);

2. Reenrollment as a consumer of the Tulare County HHSA, Visalia Adult Integrated Clinic (VAIC) for psychiatric treatment, medication management, and case management while at New Visions for Women Recovery Center;

3. Enrollment in the Tulare County HHSA SSI Advocacy Program to secure adequate disability benefits after completing treatment while at New Visions for Women Recovery Center;

4. Enrollment in Central Valley Recovery Services, Inc., New Hope Residential Treatment Program for Women, for an additional six months, funded by HHSA Mental Health, afforded to her as under contract as a consumer at VAIC; and

5. Enrollment for the Transitional Living Center (TLC) supportive housing program owned by Tulare County HHSA Mental Health upon completion of the New Hope Residential Treatment Program.

The report stated the treatment plan would complement defendant's psychiatric care and she would receive appropriate treatment for her symptoms within the two-year diversion period as required by section consistent 1001.36.

> "Ms. Standridge is finally [on] appropriate psychotropic medication regiment, abating alcohol dependence, and healing from the loss of her husband and the father of her children. Ms. Standridge is no longer responsible for the care of her teenage and young adult children, after years of facing the burdens of vicarious traumatization through their hardships that so closely resembled the hardest trials of her own life in childhood. Ms. Standridge is finally ready to pursue substantive substance use disorder and mental health treatment to address her co-occurring disorders as her late husband … had always wanted. Ms. Standridge wants to eventually repair her relationship with her family and restore herself to their children so that she can become a supportive parent to them during their adult lives. In order to do so, Ms. Standridge must restructure a great number of things in her own life, which the above treatment plan provides her the opportunity to do."

## THE DISTRICT ATTORNEY'S OPPOSITION

On January 24, 2019, the district attorney filed opposition, and argued defendant's motion was meritless for several reasons. First, the district attorney asserted defendant's motion was not based on a "recent diagnosis" because the defense exhibits cited diagnoses from a psychiatrist and three therapists that were made in 2011.

Next, the district attorney argued Mr. Beach's report failed to explain whether or how defendant's symptoms would respond to treatment, or if she could successfully complete a diversion plan within the two-year statutory period, since she started and failed other treatment plans as recently as 2017.

14.

Finally, the district attorney argued defendant failed to show that she would not pose an unreasonable risk of danger to public safety despite the escalating severity of her criminal conduct and the nature of the charged offenses she committed against her child.

The district attorney's opposition never asserted that only a psychiatrist or licensed psychologist could testify as a qualified mental health expert in support of a diversion motion brought under section 1001.36, objected to Mr. Beach's report because he lacked qualifications to prepare it, or claimed Mr. Beach was unqualified to testify in support of defendant's diversion motion.

## THE DIVERSION HEARING

### Procedural issues

On January 25, 2019, the court held a hearing on defendant's diversion motion and addressed preliminary procedural issues. The court stated it had "reconvened in open session," and directed the bailiff to open the doors and invite the public back into the courtroom.

The court stated it had reviewed defendant's motion and the district attorney's opposition. It found that Mr. Beach, the public defender's social worker, was going to testify at the evidentiary hearing. The court stated Mr. Beach should address certain issues that were not covered in defendant's motion.

The court stated it appeared to be "likely" that defendant suffered from alcohol for a long time, at least since 2011. The court further stated that there were medical records, "upon which Mr. Beach, *who I've already found to be a qualified medical expert to testify;* however, there are some things he can testify to and some things that he can't." (Italics added.)

The court stated the district attorney challenged whether defendant she suffered from an alleged affliction when she committed the charged offenses, and if she would not have committed the offense if she had "not been so afflicted." The court acknowledged AUD was defined by the DSM-5 and it was not a statutorily excluded disorder, but

15.

someone could not be "automatically" diverted to avoid prosecution because he or she was an alcoholic.

The court stated defendant's conduct of attacking her son with a knife was "heinous" and there were "tens of thousands" of people who drink that do not perform such acts. The court wanted to hear testimony about whether defendant's alleged disordered resulted in her commission of the offenses, if she could respond to treatment within the two-year diversionary period even though she previously failed to complete previous treatment programs, and if she posed a danger to the community.

Defense counsel argued that defendant's possible risk of violence was based on whether she previously suffered or been charged with certain serious offenses, and those factors did not apply in this case.

The prosecutor stated the court had to consider the possible risk of violence, and section 1001.36 provided that it could consider "the opinions of the district attorney, defense, or qualified mental health expert, and may consider defendant's violent and criminal history, the current charged offense, and any other factors that the Court deems appropriate." The court acknowledged this standard and stated that it would not grant the motion if it found defendant posed a risk of safety to the public. The court scheduled the evidentiary hearing for the following week.

**Evidentiary hearing**

On February 5 and 8, 2019, the court held the evidentiary hearing on defendant's diversion motion. Mr. Beach, the public defender's social worker, testified for defendant and was the only witness.

Mr. Beach testified defendant's most recent diagnoses were for MDD, severe, recurrent without psychotic features; PTSD; and AUD, severe. Mr. Beach's testimony was based on his review of defendant's mental health records from Health and Human

Services, between 2011 to 2017, with all diagnoses remaining intact throughout the current time.[11]

The district attorney objected and argued there was "no foundation" for Mr. Beach to make such diagnoses. The court replied, "He didn't. He reviewed the records of the psychiatrist at the Tulare County Mental Health." Mr. Beach confirmed that his testimony was based on the records of Dr. Kilgore and his team, "all of whom are licensed clinicians." The court overruled the district attorney's objection.[12]

Mr. Beach next testified about the clinical definitions for AUD, PTSD, and MDD contained in the DSM-5. Defense counsel asked how these disorders interacted in one person. The prosecutor objected and again argued Mr. Beach lacked any foundation to make that determination. The court overruled the objection.[13] Mr. Beach testified that a person with co-occurring disorders will use alcohol or illicit substances instead of prescribed psychotropic medications.

---

[11] The People have not disputed that AUD, PTSD, and MDD are identified as mental health disorders in the DSM-5. (DSM-5, § II, Substance-Related and Addictive Disorders, p. 14; Trauma and Stressor-Related Disorders, pp. 1, 6, 9–14, 21)

[12] The court correctly overruled the district attorney's evidentiary objections. "A court may conclude that a defendant's mental disorder was a significant factor in the commission of the charged offense if, after reviewing *any relevant and credible evidence, including, but not limited to*, police reports, preliminary hearing transcripts, witness statements, *statements by the defendant's mental health treatment provider, medical records, records or reports by qualified medical experts*, or evidence that the defendant displayed symptoms consistent with the relevant mental disorder at or near the time of the offense, the court concludes that the defendant's mental disorder substantially contributed to the defendant's involvement in the commission of the offense." (§ 1001.36, subd. (b)(1)(B), italics added.) "The hearing on the prima facie showing *shall be informal* and may proceed on offers of proof, *reliable hearsay*, and argument of counsel…." (§ 1001.36, subd. (b)(3), italics added.)

[13] The district attorney did not argue that Mr. Beach lacked expertise or qualifications to testify on this subject.

Mr. Beach testified that based on his review of defendant's records, she started receiving mental health services from Tulare County on an emergency basis in 2011, and the initial assessment showed "impairment that we would see with someone who has a real psychiatric emergency." Her ability to function "kind of leveled out" but her "life stressors" became worse leading up to 2016. Defendant's family dynamics eroded after her son was sexually assaulted, her risk factors escalated dramatically, and her protective factors gradually fell apart, leading to her divorce and followed by her former husband's unexpected death.

While defendant showed improvement with the medications prescribed by Dr. Kilgore and his team to address the PTSD and MDD, she failed to request medication refills when her life fell apart and the medication treatment become inconsistent.

Mr. Beach testified that defendant's life stressors reached a breaking point at the time of charged offenses: "[She] had just lost her husband. She had had to take two of her boys back into her home. Her other two boys had moved on to Los Angeles and her two boys who were with her wanted to join them in Los Angeles, and right around that time the family started contending with housing instability and suffered an eviction on the day of the alleged offense."

When defendant was arrested in this case and held at the jail, she initially received inadequate medication. By the time of the hearing, however, she was receiving the same level of medication in jail that she received from Dr. Kilgore, and it was working effectively for her.

Mr. Beach testified that defendant's three mental health disorders were responsive to treatment. Both MDD and PTSD could be treated with psychotropic and cognitive behavioral therapies. AUD had a "more complex treatment" and was responsive to different types of intervention, including fellowship and support groups.

Mr. Beach testified to his opinion that the proposed treatment plan would be effective for defendant "because this is the time for an intervention. [She] was less

18.

responsive to interventions attempted by her family while her and her husband experienced marital disputes and while various things fell apart in their household and [she] also had problem accessing treatment at that time due to broader life stressors, including some financial distress."

> "[Defendant] is now at a point where she's back on her most effective medication regimen. And the other thing that's changed is that she no longer has responsibility for raising any of her sons and the … ex-husband with whom she was having all of these disputes has unfortunately passed away. So [she] no longer has many of the responsibilities that she once had while contending with this illness, and she just needs to re-structure things, which is what this treatment plan is intended to do. It's intended to set her up with an initial seven months of treatment for both substance abuse disorders and co-occurring disorders, leading into ongoing care and case management for these psychiatric issues through Tulare County Mental Health.

> "So it's seven months of inpatient treatment to kind of re-structure and provide more support, more protective factors. Whereas, if she were released without that kind of structure, I'm afraid that she would only meet risk factors in the community. She now has no one left here to really anchor her and provide her with support. She would effectively be in the community with few to no resources."

The proposed treatment plan also provided for financial grants that would cover defendant's treatment and medication.

### The court's questions

The court asked Mr. Beach to explain why defendant would be likely to complete the diversion treatment plan, aside from the "proverbial stick" that she was in custody and diversion would allow her to avoid prosecution. Mr. Beach testified the charged offense was "the absolute rock bottom" for defendant and there was no evidence that she committed similar acts against any of her children. Defendant knew from her own childhood not to use any type of physical discipline against her children, and she had a "much longer history of attempting to abate decompensation which was successful for most of her young adult life." She only started having these serious issues in 2011, when

19.

her child was molested, and the downward spiral began. "And I would just say that within a broader analysis of her life span, if she's going to pull out of this, this is the right time to make the intervention."

The court asked how defendant's alcohol disorder interacted with the other diagnoses of PTSD and MDD. Mr. Beach testified defendant recalled blacking out during the charged offense, and "when someone is facing acute stress, such as eviction and the potential of homelessness with two sons who are aggravated with her, for good reason she acknowledges … she's in a place of acute distress."

The court asked that if defendant successfully completed diversion and was released, whether she would be able to continue to comply with treatment and medication when she was not subject to a court order. Mr. Beach said the treatment plan concluded with defendant being enrolled at the Transitional Living Center supportive housing program run by Tulare County Mental Health. The court asked how it would receive verification of defendant's compliance with the treatment program during the diversion period, and Mr. Beach said each agency would do so.

### Cross-examination

The district attorney asked Mr. Beach whether he consulted with defendant's doctors or only read their reports. Mr. Beach said he read the records and reports from defendant's doctors, and he talked with defendant several times.

The district attorney asked Mr. Beach how he knew defendant hit "rock bottom" just before the charged offenses since she was not receiving treatment at that time. Mr. Beach explained his opinion was based on defendant's statements about what was happening in her life, which were consistent with police reports about the incident. While there were no mental health records from that time, Mr. Beach believed her mental disorders were significant factors in the commission of the charged offenses based on interviews with defendant, her son, and particularly her son's guardian about serious issues that existed just prior to the incident.

20.

The district attorney asked why this was the best time for intervention compared to the other occasions when defendant failed to complete treatment. Mr. Beach testified the major differences were that she no longer had to deal with raising the children, and it would be a greater risk to public safety not to intervene at this time. Defendant had only received outpatient treatment and she became disconnected from the provider when she decompensated, but the diversion plan called for more intensive inpatient programs.

**The parties' arguments**

Defense counsel argued Mr. Beach's testimony and the supporting evidence contained in his report established the statutory factors required for diversion.

The district attorney disputed whether the defense met the burden to establish the requirements under section 1001.36, particularly whether there was evidence about defendant's mental state at the time she committed the charged offenses since there were no records for that time; whether she would respond to treatment, particularly since she resisted prior attempts to get her into treatment; and whether she would pose an unreasonable risk to public safety since her motion for OR release was denied.

## THE COURT'S RULING

On February 8, 2019, the court granted defendant's motion for pretrial diversion and made extensive findings. First, the court found that if defendant was convicted and likely sentenced to two years, she had already served one year in custody and would be eligible for release after serving six additional months.[14] The court asked the prosecutor how the interests of justice would be served to impose punishment instead of placing defendant in treatment for two years. The district attorney replied that defendant should receive a prison sentence and be held accountable for public safety reasons for the serious offense of stabbing her son.

---

[14] Defendant was charged in count 1 with felony assault with a deadly weapon in violation of section 245, subdivision (a)(1), that carries a prison term of two, three, or four years in prison. She did not have any prior felony convictions.

21.

The court acknowledged the public safety concerns, but also noted the Legislature took those concerns into account when it enacted the mental health diversion statute. The court explained why it was granting defendant's motion for diversion:

"… I believe that the statute provides the Court with more tools, more assurance of a reduction in recidivism generally or specifically to this type of thing than sending somebody to prison or sending – putting somebody on probation.

"It also allows the Court at any time during this process to say it was a great idea, but it's not working, and I'm going to terminate the diversion at any time, at any time up to the very last order when it's requested that the case gets dismissed or otherwise diverted.

"That's up to two full years of supervising somebody's life. Theoretically, I could order [defendant] to come back to court here every single day and report as to how she conducted herself yesterday, did she take her medication, all that type of thing. That's not contemplated and this is not going to be run like a Mental Health Court.

"The victim in this case lives 250 miles away. There's a criminal protective order in place. I don't think that the victim is at risk in this case…."

The court found defendant suffered from three mental disorders identified in the DSM-5; those mental disorders played a significant role in the commission of the charged offense; and her symptoms would respond to the comprehensive mental health treatment plan presented by the defense. The court asked defendant if she would consent to and comply with the treatment plan, and waive her right to a speedy trial, and she said yes.

The court ordered defendant released to the probation officer, who would deliver her to the New Hope/New Visions program, for her to comply with all further provisions of the detailed treatment program and set the matter for review hearings.[15]

---

[15] The clerk's transcript contains a minute order for the March 13, 2019, review hearing, that stated defendant was in the New Visions program and in compliance with the diversion treatment plan.

22.

**Issue on appeal**

On April 8, 2019, the district attorney's office filed the instant notice of appeal of the trial court's order of February 8, 2019, that granted defendant's motion for diversion.

On appeal, the People of the State of California, as appellant and represented by the district attorney, have not renewed the same objections to defendant's diversion motion that were raised in the written opposition or at the diversion hearing, as set forth above. Instead, the People assert that while the phrase "qualified mental health expert" is not defined in the diversion statute, the Legislature "cannot have intended for anyone with minimal mental health training to meet these qualifications" and, based on judicial decisions interpreting unrelated statutory provisions, a qualified mental health expert who testifies in support of a division motion must only be a licensed psychologist or a psychiatrist, and a social worker can never testify as an expert in support of a motion for diversion.

The People conclude the trial court's diversion order in this case must be reversed because a qualified mental health expert did not testify in support of the statutory requirements since Mr. Beach was a social worker and not a qualified expert under the People's interpretation of the statutory phrase.

The People separately assert there was insufficient evidence of a recent diagnosis by a qualified mental health expert that defendant suffered from a mental health disorder at the time of the charged offenses.

In response, defendant argues the People have forfeited review of their challenge to the expert because this objection was never raised to Mr. Beach's report or his hearing testimony in either the district attorney's written opposition or at the evidentiary hearing.

In their reply brief, the People concede that they did not raise this same objection to the expert's testimony at the diversion hearing but assert this court must still address a new issue raised for the first time on appeal because any objection would have been futile since the court already found Mr. Beach could testify as an expert before he testified at

23.

the evidentiary hearing. The People also argue their contention about the expert presents either a question of law or a mixed question of law and fact that may also be addressed for the first time on appeal.

**The People's petition for writ of mandamus**

On April 8, 2019, the same day they filed the notice of appeal, the People also filed a petition for a writ of mandamus with this court, requesting an order directing the superior court to vacate its order that granted defendant's motion for diversion, and to hold a new hearing to address the People's contention that only a psychiatrist or licensed psychologist may testify as a qualified mental health expert in support of a diversion motion.

In their petition, the People stated that while an appeal of the court's order was permitted by *People v. Wright* (2002) 99 Cal.App.4th 201, 204, they were requesting a writ of mandamus "because this Court may not agree with the analysis in *Wright* that the order is appealable," and the interests of justice mandated a speedy review of the trial court's decision. The People filed documentary exhibits in support of the writ, identical to the documents in the clerk's and reporter's transcript of this appeal as summarized above.

On May 9, 2019, this court denied the People's petition for writ of mandamus without comment or requesting further briefing (*The People v. Superior Court of Tulare County*, F079064). Thereafter, on June 18, 2019, the People filed their opening brief in this pending appeal.

## DISCUSSION

### I.   The People Forfeited Their Appellate Challenge to the Expert Testimony

We agree with defendant that the People have raised an issue in this appeal that was not presented at the diversion hearing and have thus forfeited appellate review of this contention. It is well-settled that "[a] party desiring to preserve for appeal a challenge to the admission of evidence must comply with the provisions of Evidence Code section

24.

353, which precludes reversal for erroneous admission of evidence unless: 'There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated to make clear the specific ground of the objection or motion.' The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal. [Citation.]" (*People v. Morris* (1991) 53 Cal.3d 152, 187–188; *People v. Partida* (2005) 37 Cal.4th 428, 434.)

"[T]he objection [must] fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling. If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial. A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida, supra,* 37 Cal.4th at p. 435.)

"A century ago, long before the Evidence Code existed, we explained the need for a specific objection. 'To require this is simply a matter of fairness and justice, in order that cases may be tried on their merits. Had attention been called directly in the court below to the particular objection which it is now claimed the general objection of appellant presented, that court would have had a concrete legal proposition to pass on, and counsel for [respondent] would have been advised directly what the particular complaint against the question was, and, if he deemed it tenable, could have withdrawn the inquiry or reframed his question to obviate the particular objection.…" (*People v.*

25.

*Partida, supra,* 37 Cal.4th at p. 434, citing *Bundy v. Sierra Lumber Co.* (1906) 149 Cal. 772, 776; *People v. Morris*, *supra*, 53 Cal.3d at pp. 187–188.)

" ' "An appellate court will ordinarily not consider procedural defects or [alleged] erroneous rulings, in connection with relief sought or defenses asserted, where an objection could have been, but was not, presented to the lower court by some appropriate method …. The circumstances may involve such intentional acts or acquiescence as to be appropriately classified under the headings of estoppel or waiver …. Often, however, the explanation is simply that it is *unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial." ' [Citation.]" (*People v. Saunders* (1993) 5 Cal.4th 580, 589–590.)[16]

## A. *Failure to Object to an Expert Witness*

The forfeiture rule has been applied to an appellant's failure to object to the qualifications of an expert witness at trial, and then attempting to raise a new objection to the expert's testimony on appeal. (*People v. Doolin* (2009) 45 Cal.4th 390, 448; *People v. Panah* (2005) 35 Cal.4th 395, 477–478 (*Panah*); *People v. Farnam* (2002) 28 Cal.4th 107, 162 (*Farnam*).)

In *People v. Nwafor* (1996) 46 Cal.App.4th 39 (*Nwafor*), the prosecutor called an expert witness to testify in a child molestation case. The expert had a doctorate in developmental psychology and over 10 years of experience working with child molestation victims. Defense counsel said he was satisfied the court would find that she was qualified to testify as an expert and did not object. On appeal, however, the defendant argued for the first time that the expert was not qualified, and the trial court

---

**16** "In this context, the terms 'waiver' and 'forfeiture' have long been used interchangeably. The United States Supreme Court ... observed, however: 'Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the "intentional relinquishment or abandonment of a known right." [Citations.]' [Citation.]" (*People v. Saunders, supra*, 5 Cal.4th at p. 590, fn. 6.)

improperly allowed her to testify. *Nwafor* held the defendant's contention was "frivolous and, since no objection was made in the trial court, untimely. [Citation.]" (*Id.* at p. 47.)

In *People v. Bolin* (1998) 18 Cal.4th 297 (*Bolin*), the prosecutor called a criminalist to testify about his review of photographs of a homicide scene. The criminalist testified to his opinion about the positions of the victims' bodies when they were shot, based on his analysis of the blood spatter and drips shown in the photographs. On appeal, the defendant argued for the first time that the criminalist was not qualified to testify as an expert, his opinions were inadmissible because he did not personally investigate the crime scene, and the testimony was prejudicial under Evidence Code section 352. *Bolin* held that "[s]ince [the defendant] failed to make these objections at trial, the issue is waived. [Citations.]" (*Bolin*, *supra*, 18 Cal.4th at p. 321.)

In *Farnam, supra,* 28 Cal.4th 107, a criminalist testified as a prosecution expert on blood spatters, reviewed photographs of the homicide scene, and gave his opinion about the sequence of events and length of time leading to the victim's sexual assault and murder. (*Id.* at p. 161.) At trial, defense counsel objected to the criminalist's blood spatter testimony "as assuming facts not in evidence, speculative, and conclusory. But counsel affirmatively stated they had no objection if [the criminalist] were to 'reconstruct the way the crime may have occurred' and did not challenge [the criminalist's] qualifications to provide expert opinion on blood spatters." (*Id.* at p. 162.)

On appeal, however, the defendant argued for the first time that the criminalist "was not qualified to render an expert opinion on blood spatters [citation] and that therefore his conclusions as to the sequence of events were conjectural and speculative." (*Farnam, supra,* 28 Cal.4th at pp. 161–162.) *Farnam* rejected the defendant's appellate claim because "[a]t most, [defense] counsel objected to [the criminalist's] qualifications with respect to estimating the amount of time elapsing from the start to the finish of the attack on the victim. Consequently, the defendant's challenges to [the criminalist's]

testimony regarding blood spatters and crime scene reconstruction have been forfeited. [Citations.]" (*Id*. at p. 162.)

In *Panah, supra*, 35 Cal.4th 395, the defendant objected to a hypothetical question posed to the prosecution's forensic serologist. During a sidebar hearing on that objection, "defense counsel disparaged [the serologist's] qualifications but the reason he sought [an Evidence Code section] '402 hearing' was because he claimed the attempted hypothetical question amounted to a 'new theory.'" (*Id*. at p. 477.) The trial court denied the request, stated it was satisfied the witness was an expert, and held defense counsel could cross-examine him about his opinions. (*Ibid*.) On appeal, the defendant claimed the trial court erroneously denied his motion for a hearing pursuant to Evidence Code section 402 about the expert's qualifications to testify to his opinions. *Panah* held the defendant forfeited this argument because "[t]he record reveals … that [the] defendant never made such a request" (*Panah*, at p. 477), he only requested an evidentiary hearing because of an objection to a particular hypothetical question, and concluded that the "[d]efendant's failure to have challenged [the serologist's] expert qualifications in the trial court forfeits his claim. [Citation.]" (*Id*. at p. 478.)

## B.    *Analysis*

It is clear that during the entirety of the proceedings in this case, the People never raised the broad objection that is being asserted in this appeal in either the written opposition to defendant's diversion motion or at the hearings on that motion – that only a psychiatrist or licensed psychologist is a qualified mental health examiner who may testify in support of any diversion motion brought under section 1001.36.

Instead, the People's objections were based on whether defendant could establish the statutory factors required for the court to grant pretrial diversion. In the written opposition and at the evidentiary hearing, the district attorney argued there was no evidence that defendant was diagnosed with any mental disorders at the time of the charged offenses since she was no longer received treatment at that time; defendant could

28.

not show that her symptoms would respond to treatment since she had failed prior treatment programs; and defendant posed an unreasonable risk of danger to public safety because she attacked her minor child with a knife.

As in *Nwafor, Bolin, Farnam,* and *Panah*, the People have raised a new objection to the expert's testimony in this appeal that was not made before the trial court and has thus forfeited appellate review of this claim – that a social worker could not testify in support of a diversion motion and the defendant had to call either a psychiatrist or licensed psychologist.

In response to defendant's appellate claim of forfeiture, the People conceded in their reply brief that they did not raise this same challenge to the expert at the diversion hearing. Instead, the People assert that any objection would have been futile because "at the outset of the evidentiary hearing to determine whether [defendant] would be eligible for Mental Health Diversion, the Court referred to Mr. Beach's testimony and stated it had 'already found [him] to be a qualified medical expert' who could testify at the hearing regarding [defendant's] eligibility under Penal Code section 1001.36. [¶] The Court made the statement regarding Mr. Beach's qualifications at the outset of the hearing, before Mr. Beach had even been called to the stand. [The People were] was not given the opportunity to object before the court made its ruling, and it would have been futile to do so, as the court already noted its ruling. Therefore, this issue may be raised for the first time on appeal."

The People's assertion of futility is refuted by the record, and the context in which the court made the above statements. As explained above, defendant's written motion for diversion was based on an extensive supporting report prepared by Mr. Beach, and that report identified him as a social worker. The district attorney filed written opposition that challenged whether defendant could meet her burden to establish the statutory elements for diversion but did not challenge the admission of Mr. Beach's report, the opinions stated in that report, object to his possible appearance at an evidentiary hearing, or assert

29.

the defense had to call a psychiatrist or licensed psychologist to testify in support of the motion.

The court held the first hearing on defendant's diversion motion on January 25, 2019. As that hearing began, the court stated it had "reconvened in open session," directed the bailiff to open the doors and invite the public back into the courtroom and stated it had already reviewed defendant's motion and the district attorney's opposition. The court stated Mr. Beach was going to testify at the evidentiary hearing and he should address certain evidentiary issues. The court then stated that there were medical records "upon which Mr. Beach, *who I've already found to be a qualified medical expert to testify;* however, there are some things he can testify to and some things that he can't." (Italics added.) The court invited the parties to make preliminary arguments on the motion. Both defense counsel and the district attorney addressed the issue of whether defendant posed a risk to public safety. The court scheduled the evidentiary hearing for the following week and adjourned.

It is incumbent upon the People to have made a record concerning the nature of their objection with clarity and specificity. Any supposition of futility by counsel about how the court would have ruled in this instance is unpersuasive.

While the court stated it had "already found" Mr. Beach was a qualified medical expert, the entirety of the record strongly suggests the court had just made such a finding at a closed hearing immediately before the open hearing began, and that closed hearing was not on the record given the court's use of the past tense, along with its statements that it was reconvening in "open session" and directing the bailiff to allow the public to enter the courtroom. The court asked the parties if they wanted to address any other issues and did not place any limits on that invitation. The district attorney clearly had the opportunity to place any objections on the record that may have been raised in the closed session about Mr. Beach's appearance and/or qualifications as an expert but failed to do so. Instead, the district attorney focused on the failure of defendant's motion to address

30.

whether she posed a risk to public safety and argued that issue without any limitation from the court.  It was incumbent on the People to make a record of any objections it made before the court went on the record with clarity and specificity.  The People's supposition of futility about how the court would have ruled in this instance is unpersuasive.

The entirety of the record also demonstrates that the court did not limit or restrict the district attorney's ability to raise objections during the subsequent evidentiary hearing that was held over two separate days.  Mr. Beach began his direct examination testimony by address defendant's mental health diagnoses.  The district attorney immediately objected and argued there was "no foundation" for Mr. Beach to make such diagnoses. The court replied, "He didn't.  He reviewed the records of the psychiatrist at the Tulare County Mental Health."  Mr. Beach confirmed that his testimony was based on the records of Dr. Kilgore and his team, "all of whom are licensed clinicians."  The court did not reject district attorney's objection because of its earlier finding at the first hearing but allowed the objection to be made and then correctly overruled it.  The district attorney had an opportunity to either place on the record or restate any general objections to the social worker's testimony but again failed to raise the issue.  We thus reject the People's claim of futility since the court did not make any statements or findings that would have prevented the district attorney from making or restating any objections throughout the three days of hearings in this case.

Next, the People assert this court must address the new issue raised on appeal because their interpretation of a qualified mental health expert simply presents a question of law under section 1001.36 based on undisputed facts.  The People primarily rely on *People v. Yeoman* (2003) 31 Cal.4th 93 (*Yeoman*) in support of this assertion.  In *Yeoman*, the defendant objected at voir dire that the People were improperly using peremptory challenges to exclude African-Americans from the jury in violation of *People v. Wheeler* (1978) 22 Cal.3d 258.  The trial court made factual findings and held the

defendant failed to make a prima facie case under *Wheeler*. On appeal, the defendant renewed his *Wheeler* arguments and, for the first time on appeal, asserted an equal protection claim based on *Batson v. Kentucky* (1986) 476 U.S. 79. The People claimed the defendant waived any appellate claim of *Batson* error because he failed to raise it during voir dire. (*Yeoman, supra*, 31 Cal.4th at pp. 115–116.)

*Yeoman* held that the defendant did not waive the *Batson* argument:

"[W]e believe that to consider defendant's claim under *Batson* ... is more consistent with fairness and good appellate practice than to deny the claim as waived. As a general matter, no useful purpose is served by declining to consider on appeal a claim that merely restates, under alternative legal principles, *a claim otherwise identical to one that was properly preserved by a timely motion that called upon the trial court to consider the same facts and to apply a legal standard similar to that which would also determine the claim raised on appeal*. Defendant's *Batson* claim is of that type. His motion under *Wheeler* ... required the trial court to conduct *the same factual inquiry* required by *Batson* into the possibly discriminatory use of peremptory challenges, and to apply a standard identical to *Batson's* for determining whether [the] defendant had stated a prima facie case. [Citation.] Under these circumstances, the *Batson* claim is properly cognizable on appeal by analogy to the well-established principle that a reviewing court may consider a claim raising a pure question of law on undisputed facts. [Citations.]…. Nor does it impose any additional burden on us, as the reviewing court. [¶] Accordingly, we may properly consider [the] defendant's *Batson* claim on the merits. Doing so, we conclude it fails for the same reason his *Wheeler* claim fails." (*Yeoman, supra*, 31 Cal.4th at pp. 117–118, italics added, fn. omitted.)

We find *Yeoman* does not support the People's claim that we must address this admittedly new challenge to the expert that they have raised in this appeal. In contrast to *Yeoman*, the People have not raised a claim, under alternative legal principles, that is "otherwise identical to one that was properly preserved by a timely motion that called upon the trial court to consider the same facts and to apply a legal standard similar to that which would also determine the claim raised on appeal." (*Yeoman, supra*, 31 Cal.4th at p. 117.) Instead, the People have raised a completely different argument that was never addressed by either the court or defendant over the three days of the diversion hearing.

As the People concede, section 1001.36 does not define a "qualified mental health professional," and the People's arguments about what type of expert falls within that phrase are based on analogizing the diversion statute to other unrelated statutory proceedings. There is thus no argument that the court issued an order in this case that was facially void as a matter of law.

The People's attempt to raise a new issue in this particular case illustrates the importance of why a party must comply with Evidence Code section 353 and raise a timely objection before the trial court. "[A] specifically grounded objection" that a social worker can never testify as a qualified mental health examiner in any diversion hearing would have allowed "the trial judge to consider excluding the evidence," and "the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal. [Citation.]" (*People v. Morris, supra,* 53 Cal.3d at pp. 187–188; *People v. Partida, supra,* 37 Cal.4th at p. 434.)

As demonstrated above, the People's repeated objections to defendant's diversion motion were based on whether she met her burden to establish the elements required by section 1001.36. While the People objected when Mr. Beach testified about defendant's mental health diagnoses, the court correctly overruled that objection because Mr. Beach explained his testimony was based on defendant's mental health records and the diagnoses made by her treatment teams. In the course of raising these objections, the People had the opportunity to argue that a social worker could never be considered a qualified mental health expert who could offer an opinion in support of any diversion motion brought under section 1001.36 but failed to do so.

As explained above, there is nothing in the record to show the trial court would have refused to consider such an objection or an objection would have been futile. If such an objection had been raised, the trial court could have held a hearing on that particular issue, and, if it was inclined to grant the motion, defense counsel may have

33.

decided to request a continuance to call the appropriate expert to testify in support of the motion.

Given the People's failure to raise the issue, defendant did not have the opportunity to consider an alternate strategy to ensure the motion would be properly supported. " ' "[I]t is *unfair to the trial judge and to the adverse party* to take advantage of an [alleged] error on appeal when it could easily have been corrected at the trial." ' [Citation.]" (*People v. Saunders, supra,* 5 Cal.4th at p. 590.) The People thus forfeited appellate review of its new challenge to the testimony of Mr. Beach.

## II. The Trial Court's Factual Findings are Supported by the Record

In their opening brief, the People separately assert that defendant "did not offer evidence of a recent diagnosis by a qualified mental health expert" that she suffered from a mental health disorder at the time of the charged offenses. In making this argument, the People point to Mr. Beach's testimony that defendant's mental health records went up to June 2017, he did not know if she received mental health treatment after that time, and her last diagnosis was at least 18 months before the charged offenses.

At the end of the evidentiary hearing, the district attorney argued the diversion motion should be denied because there was insufficient evidence of a recent diagnosis. On appeal, the People appear to challenge the sufficiency of the evidence on this issue, independent of its primary claim that only a psychiatrist or licensed psychologist may testify in support of a diversion motion. We thus turn to whether the trial court's finding on this issue is supported by substantial evidence.

### A. *Section 1001.36 and Evidence of a "Recent Diagnosis"*

"Evidence of the defendant's mental disorder shall be provided by the defense and shall include a recent diagnosis by a qualified mental health expert." (§ 1001.36, subd. (b)(1)(A).)

"A court may conclude that a defendant's mental disorder was a significant factor in the commission of the charged offense if, after reviewing any relevant and credible

evidence, including, but not limited to, police reports, preliminary hearing transcripts, witness statements, statements by the defendant's mental health treatment provider, medical records, records or reports by qualified medical experts, or evidence that the defendant displayed symptoms consistent with the relevant mental disorder at or near the time of the offense, the court concludes that the defendant's mental disorder substantially contributed to the defendant's involvement in the commission of the offense." (§ 1001.36, subd. (b)(1)(B).) "The hearing on the prima facie showing shall be informal and may proceed on offers of proof, reliable hearsay, and argument of counsel…." (*Id.*, subd. (b)(3).)

The trial court's decision on a motion for diversion is reviewed for an abuse of discretion, and factual findings are reviewed for substantial evidence. (*Moine, supra*, 62 Cal.App.5th at pp. 447–449; *People v. Oneal, supra,* 64 Cal.App.5th at p. 589.)

### B.    *Analysis*

The trial court's factual findings in support of its decision to grant defendant's diversion motion are supported by substantial evidence of a "recent diagnosis" of a qualifying mental health disorder.

On direct examination, Mr. Beach testified that defendant's most recent diagnoses were for the mental health disorders of MDD, severe, recurrent without psychotic features; PTSD; and AUD, severe. Mr. Beach explained his testimony was based on his review of defendant's mental health records between 2011 to 2017, with all diagnoses remaining intact throughout the current time. Defendant showed improvement with the medications prescribed by Dr. Kilgore and his team, but she failed to request medication refills when her life fell apart and the medication treatment become inconsistent.

Mr. Beach testified defendant's life stressors reached a breaking point at the time of charged offenses because "she had just lost her husband. She had had to take two of her boys back into her home. Her other two boys had moved on to Los Angeles and her two boys who were with her wanted to join them in Los Angeles, and right around that

time the family started contending with housing instability and suffered an eviction on the day of the alleged offense."

When defendant was arrested in this case and held in jail, she initially received inadequate medication. By the time of the hearing, however, the jail psychiatrist prescribed the same level of medication that she previously received from Dr. Kilgore and it was working effectively.

On cross-examination, the district attorney asked Mr. Beach how he knew defendant hit "rock bottom" just before the charged offenses since she was not receiving treatment in 2018. Mr. Beach explained his opinion was based on defendant's statements about what was happening in her life, which were consistent with police reports about the nature and circumstances of the incident. While there were no mental health records from that precise time, Mr. Beach testified that defendant's mental disorders were significant factors in the commission of the charged offenses based on interviews with defendant, her son, and particularly her son's guardian about her behavior and the serious issues that existed just prior to the incident, and their failed attempts to get her into treatment.

The People are correct that defendant was not receiving mental health treatment at the time of the charged offenses in 2018, but that does not end the analysis. Mr. Beach explained the basis for his conclusion that she continued to suffer from the same three mental health conditions at the time of the charged offenses. When she was arrested in this case, the jail psychiatrist eventually placed her on the same medication regimen that had been successfully used by Dr. Kilgore and his team, and she again positively responded to the treatment. Mr. Beach relied on eyewitness reports about her erratic behavior and the successful medication regimen used by the jail psychiatrist to testify that about her condition at the time of the charged offenses.

There is thus substantial evidence in the record to support the court's finding that defendant suffered from three mental disorders identified in the DSM-5; those mental

disorders played a significant role in the commission of the charged offense; and her symptoms would respond to the comprehensive mental health treatment plan presented by the defense.[17]

### DISPOSITION

The trial court's order of February 8, 2019, granting defendant's motion for diversion, is affirmed.

POOCHIGIAN, ACTING P. J.

WE CONCUR:

SMITH, J.

SNAUFFER, J.

---

**[17]** In their reply brief, the People attempt to evade the forfeiture problem by arguing that their newly raised appellate contention about the qualified mental health expert presents a mixed question of fact and law that may be addressed for the first time on appeal. The People assert the disputed factual part of the question is that defendant failed to present evidence from a qualified mental health expert of a recent diagnosis to establish the elements required by section 1001.36. In making this assertion to evade forfeiture, the People pivot back to the argument raised in their opening brief, that "the trial court erred in deciding that a 2015 diagnosis was appropriately 'recent' under the terms of Section 1001.36."

We have already addressed and rejected the People's assertion that there is insufficient evidence to support the court's finding about a recent diagnosis. We have also rejected the People's claim that their challenge to the expert is a limited question of law and decline to further address an issue that was not raised before the superior court.